MARCOIN, INC. v. JOHN E. McDANIEL

No. 8328SC1142

(Filed 2 October 1984)

**1. Fraud § 12.1— insufficient evidence of fraud**

The evidence failed to show a false representation or concealment of any material fact by plaintiff's employee constituting fraud in the inducement of license agreements where the evidence showed that the only representation plaintiff's employee made was that the $500 maximum monthly fee was subject to a cost-of-living increase every five years and that such representation was true; defendant admitted that he had read a paragraph of the license agreements clearly stating that a new fee schedule could be established every five years; and defendant presented no evidence that plaintiff's employee implied that because the agreements stated that the maximum fee was subject to change the rest of the fees were not.

**2. Contracts §§ 12, 26.1— licensing agreements—fee provisions unambiguous— parol evidence properly excluded**

The fee provisions of licensing agreements were not ambiguous as to what future changes could be made in the fee schedule, and the trial court thus properly invoked the parol evidence rule to exclude a "fact sheet" furnished to the licensee which discussed the licensing fees.

**3. Contracts § 12— licensing agreements—construction of fee provisions**

The trial court properly construed licensing agreements to permit a cost-of-living increase every five years for the fee schedule as well as for the maximum monthly fee.

**4. Contracts § 23— waiver of breach**

Defendant waived plaintiff's breach of a licensing agreement in failing to furnish defendant with a blanket fidelity bond by continuing to accept performance under the contract after plaintiff informed defendant that it could no longer furnish the bond.

**5. Contracts § 17.2— termination of contract—liability for fees during notice**

Defendant was liable to plaintiff for licensing fees for three months where the licensing agreement provided that the shortest notice a party could give of voluntary termination of the agreement was 90 days, and defendant thus owed license fees until the end of the 90-day period.

**6. Damages § 11.2— breach of licensing agreement—no entitlement to punitive damages**

The evidence showed only a fraudulent conveyance rather than a legal fraud, and plaintiff was thus not entitled to recover punitive damages for defendant's breach of a licensing agreement, where it established that the agreement required defendant to sell his client accounts to plaintiff upon termination of the agreements, that defendant sold his client accounts for far less than market value to a corporation whose stockholders were related to defend-

ant or were his close business associates, and that the accounts were sold during pendency of a suit wherein substantial damages were sought.

**7. Damages § 11.1— punitive damages for breach of contract**

Punitive damages are generally not allowable for a breach of contract unless the breach constitutes or is accompanied by an identifiable tort which contains some element of aggravation.

**8. Trial § 3.2— denial of continuance—adequate time to prepare case**

Defendant was not denied an adequate time to prepare his case by the trial court's denial of his motion to continue because only five days elapsed from the time defendant began discovery on amended issues until the trial where defendant had more than two months to prepare his case for trial but opted to wait until the disposition of certain motions, including a motion to dismiss the amended issues, before he commenced discovery.

**9. Trial § 10.1— comments by trial judge—no expression of opinion**

The trial judge did not express an opinion on the evidence in commenting to the attorneys, "I don't want you gentlemen to play games," or in stating, "I don't want any to the best of your knowledge."

APPEAL by defendant from *Lewis, Robert D., Judge*. Judgment entered 16 December 1982 in Superior Court, BUNCOMBE County. Heard in the Court of Appeals 27 August 1984.

Plaintiff, a licensor of business financial management services, instituted this action against defendant, its Asheville territory licensee, on 11 December 1980. Claiming breach of contract, plaintiff sought to recover license fees for June through October 1980, as well as specific performance of a provision of the license agreements which required the defendant to sell all of his clients to the plaintiff. The defendant counterclaimed, alleging breach of contract and fraud in the inducement.

At trial during the 20 September 1982 civil term, it was discovered that subsequent to the commencement of this action, defendant had sold his client accounts to a corporation in which his wife and three children held four-sevenths of the stock. A former employee and two close business associates held the remainder of the stock. The court allowed plaintiff to file an amended complaint in which fraud was added to the existing allegations. A request for compensatory damages in the event specific performance was found to be impossible, and a request for punitive damages were added to the existing prayers for relief.

At the close of the evidence, the court directed a verdict in favor of plaintiff on its claim for license fees. The court directed verdicts against defendant on his counterclaims. The court reserved judgment on plaintiff's claim for specific performance, setting the trial of the amended issues for 6 December 1982.

On 24 November 1982 the court denied defendant's motions to dismiss plaintiff's claims under the amended complaint, for a mistrial and for a new jury to hear the amended issues. On 6 December 1982 the court denied defendant's pretrial motion for a continuance. Thereafter, trial was had and the jury returned a verdict in favor of plaintiff, finding that defendant had breached the contracts' provisions concerning sale of clients and that defendant had acted fraudulently in so doing. Plaintiff was awarded compensatory and punitive damages.

*Roberts, Cogburn, McClure & Williams, by Max O. Cogburn and Isaac N. Northup, Jr., for plaintiff appellee.*

*Elmore & Powell, P.A., by Ronald W. Mack and John A. Powell, for defendant appellant.*

VAUGHN, Chief Judge.

Defendant's first argument is that the court committed error in directing verdicts against defendant's counterclaims for fraud in the inducement and for breach of the license agreements. We address first the question of fraud in the inducement.

[1] In support of his claim of fraud, defendant presented the following evidence: In January 1975, defendant and his wife met with Mr. David Hinze, an employee of plaintiff corporation, to discuss the benefits and responsibilities of becoming plaintiff's licensee. Defendant was interested in becoming a licensee of two of plaintiff's services, Marcoin Management Services (MMS) and Busco Business Services (BUSCO). He had an opportunity to examine the blank license agreements for both services. Paragraph 11 of both agreements reads, in pertinent part:

> This Agreement shall automatically be reopened every five (5) years for review by First Party [Plaintiff] and if covenants and undertakings assumed by Second Party in this Agreement are truly and faithfully being performed, the con-

Marcoin, Inc. v. McDaniel

tract will automatically be continued for a term of five (5) years on the same terms and conditions except that the prevailing fee schedule as established by First Party at the time of review shall apply for the next five (5) year term.

Paragraph 4 of these agreements reads, again in pertinent part:

4.   FIRST PARTY'S FEES:

| When Gross Billings Are | | Monthly Base Fee Is | Plus This Percentage | On All Gross Billings Over |
|---|---|---|---|---|
| At Least | But less Than | | | |
| $  -0- | $1,500.00 | $  -0- | 12% | $  -0- |
| 1,500.00 | 2,000.00 | 180.00 | 10% | 1,500.00 |
| 2,000.00 | 2,500.00 | 230.00 | 8% | 2,000.00 |
| 2,500.00 | 3,000.00 | 270.00 | 6% | 2,500.00 |
| 3,000.00 | | 300.00 | 4% | |
| and Over | | *To Maximum of $500.00 | | |

*A maximum of $500.00 monthly commission will be paid. Subject to the terms of paragraph 11, "Term of Agreement," where cost-of-living escalation can be a consideration.

Defendant was uncertain as to how paragraph 4 would be interpreted in light of paragraph 11. He expressed his uncertainty to Mr. Hinze. Defendant has presented no evidence showing what Mr. Hinze said as to how these paragraphs were to be interpreted. Mr. Hinze did, however, provide defendant with a "Fact Sheet" for MMS and BUSCO. The section of the BUSCO fact sheet which discussed fees read:

[R]ange is from 12% (less than $1,000/month billing) to 4% (over $3,000). Has maximum of $500/month. Maximum is subject to cost-of-living adjustment every five years.

The MMS fact sheet said essentially the same thing.

After reading the fact sheets, defendant stated that he was satisfied as to how the contracts were to be interpreted. Defendant asked Mr. Hinze about the maximum fees. Mr. Hinze responded that the fact sheets accurately reflected the company's policy.

On 1 March 1975, defendant signed both the MMS and the BUSCO license agreements. On 29 February 1980, near the end of

the first five year term, defendant received a letter from plaintiff stating that effective April 1980, and in accordance with paragraph 11 of the license agreements, a new fee schedule for both MMS and BUSCO would apply. The new schedule provided for a $100 base fee plus seven percent of client billings.

Defendant contends that when this evidence is considered in a light most favorable to him, it demonstrates a clear case of fraud. His argument is that Mr. Hinze led him to believe that the only item subject to modification every five years was the maximum fee and that the fee schedule itself would remain constant over the 25 year life of the contract.

To make out a case of actionable fraud, defendant must show that Mr. Hinze made a representation relating to some material past or existing fact; that the representation was false; that Mr. Hinze knew the representation was false when it was made or made it recklessly without any knowledge of its truth and as a positive assertion; that Mr. Hinze made the false representation with the intention that it should be relied upon by defendant; that defendant reasonably relied upon the representation and acted upon it; and that defendant suffered injury. *See, e.g., Johnson v. Insurance Co.,* 300 N.C. 247, 266 S.E. 2d 610 (1980).

The only representation that defendant shows Mr. Hinze made was that the $500 maximum monthly fee was subject to a cost-of-living increase every five years. This representation was true, and thus cannot be the basis for an action in fraud. Nor can defendant argue that Mr. Hinze's statement served to conceal the plaintiff's right to modify the fee schedule. Paragraph 11 of the license agreements clearly states that a new fee schedule can be established every five years. Defendant admits that he read paragraph 11. Additionally, he presents no evidence that Mr. Hinze implied that because the contracts also stated that the maximum fee was subject to change the rest of the fees were not. Having truthfully and fully answered all questions asked of him by defendant, Mr. Hinze had no duty to initiate additional discussion as to the construction of clearly stated terms. Since no false representation was made and there was no concealment of any material fact, the trial court was correct in directing a verdict against defendant on the question of fraud.

We next consider whether it was appropriate to direct a verdict against defendant on his breach of contract counterclaim. Defendant contends the directed verdict was improper for four reasons. We will address these contentions serially.

[2] Defendant claims the MMS and BUSCO contracts are ambiguous because paragraphs 4 and 11 are unclear as to what future changes can be made in the fee schedules and that their construction should have been a question for the jury. Further, he maintains that it was error to invoke the parol evidence rule to exclude the fact sheets from consideration since they served to clarify and explain the unclear provisions.

We find no ambiguity in the language of the contracts' fee provisions. The provisions of paragraphs 4 and 11 are completely consistent with one another. Paragraph 11 establishes a 25 year contractual term which is subject to the substitution of a new fee schedule every five years. Paragraph 4 establishes the fee schedule for the first five year period. It also establishes a maximum monthly fee and, by way of clarification, notes that the maximum is not unalterable; it too is subject to change every five years. When a contested provision is not ambiguous its construction is a matter of law for the court. *See Lowe v. Jackson*, 263 N.C. 634, 140 S.E. 2d 1 (1965); *MAS Corp. v. Thompson*, 62 N.C. App. 31, 302 S.E. 2d 271 (1983). The trial court was therefore correct in removing the question of construction from the jury's consideration. Further, since the contracts were unambiguous, it was not error to invoke the parol evidence rule to exclude consideration of the fact sheets. *See Lineberry v. Lineberry*, 59 N.C. App. 204, 296 S.E. 2d 332 (1982).

[3] The defendant argues that if the contracts are not ambiguous, the court erred in its construction of them. The construction the defendant would have us accept is that the sentence in paragraph 4 which refers to increases in the monthly maximum fee defines what may be changed under the provisions of paragraph 11. Defendant contends that the proper construction of these contracts is that paragraph 4 allows only the *maximum* fees to be changed and that the fee schedules themselves may not be altered in any way during the 25 year term of the contract.

In urging that we accept such a construction, the defendant is, in effect, asking us to ignore two basic principles of contract

construction. The first is that a contract must be construed as a whole, considering each clause and word with reference to all other provisions and giving effect to each whenever possible. *State v. Corl*, 58 N.C. App. 107, 293 S.E. 2d 264 (1982); 4 S. Williston, *A Treatise On The Law of Contracts*, § 618(3) (3d ed. 1961). The second is that the common or normal meaning of language will be given to the words of a contract unless the circumstances show that in a particular case a special meaning should be attached to it. *Jamestown Mut. Ins. Co. v. Nationwide Mut. Ins. Co.*, 266 N.C. 430, 146 S.E. 2d 410 (1966), *modified on other grounds*, 277 N.C. 216, 176 S.E. 2d 751 (1970). 4 S. Williston, *supra*, § 618(1). Defendant's proposed construction would render meaningless much of paragraph 11 and would require that "fee schedule" be interpreted as meaning maximum fee. As defendant has provided no reason for us to believe that his strained construction is more reflective of the parties' intent than a more reasonable construction guided by traditional principles, we find his argument to be without merit.

Second, defendant contends that the trial court erred in holding that the new fee schedule did not constitute a material breach of the MMS and BUSCO contracts. This argument is premised on the assumption that the contracts would be given the construction defendant has urged. As the premise is incorrect, this argument must fail.

[4] Next, defendant contends that on the claim of breach of a third agreement, he presented sufficient evidence to withstand a motion for directed verdict. The evidence shows that on 1 March 1975 defendant entered into a license agreement with plaintiff in which defendant became the Asheville territory licensee of a small business ownership transfer service owned by plaintiff and known as Associated Bonded Escrow Company (ABECO). Paragraph 2(b) provides that the contract shall automatically continue for seven one-year periods after the initial three-year term, which was to begin 1 March 1975, unless terminated in writing by either party 90 days prior to the anniversary date of the contract. Paragraph 7(d) requires plaintiff to furnish defendant with a blanket fidelity bond. On 16 February 1978 plaintiff sent a letter to all ABECO licensees, informing them that their current bond coverage had been terminated due to changes in the insurance industry beyond plaintiff's control, and that they could acquire, after being

individually approved by plaintiff's carrier, a new individual bond for a $25 monthly minimum and that the plaintiff would be willing to mutually terminate the license agreement if the licensee so desired. Defendant did not respond to this letter despite a second request to do so, but, in a letter of 13 June 1978, responding to a subsequent letter from plaintiff, defendant claimed that plaintiff was in breach under paragraph 7(d). Defendant next received a letter from plaintiff, dated 27 July 1979, informing him that plaintiff would terminate the agreement effective 1 March 1980.

Although it is not entirely clear from the evidence on what date the original bond coverage terminated, plaintiff concedes there was a period of time before 1 March 1980 when defendant was without coverage under the original blanket fidelity bond. However, it is plaintiff's contention that it met its contractual obligation to defendant by serving as the insurer itself and by accepting all attendant liability during that period.

We do not need to decide whether plaintiff's decision to self-insure defendant until it could terminate the ABECO agreement constituted a material breach, as the evidence indicates that defendant waived any breach on plaintiff's part by continuing to accept performance under the contract. *See Wheeler v. Wheeler,* 299 N.C. 633, 263 S.E. 2d 763 (1980). Defendant's own testimony indicates that he continued to gain business clients directly from ABECO business changeover transactions after 16 February 1978. Therefore, a directed verdict against defendant on plaintiff's breach of the ABECO agreement was proper.

Finally, defendant asserts that the court erred in disallowing certain evidence defendant believed essential to his counter-claims. In some instances, the evidence was, in fact, admitted, and in others, it was barred by the parol evidence rule. Although we find some evidence pertinent to the issue of damages may have been excluded, since verdicts were directed against the claims for which the evidence was offered, any error was harmless.

[5] Defendant's second argument is that the trial court erred in directing a verdict in favor of plaintiff as to license fees owed for the months of June, July, August and September, 1980. We disagree. Rather than finding defendant to be in breach of the agreements, the trial court determined that defendant's letter of 1 July 1980, in which he stated that he "hereby terminate[s]" both the

MMS and BUSCO agreements, constituted a voluntary termination of the contracts. The contract clearly stipulates that the shortest notice one may give of voluntary termination is 90 days. Thus, defendant owed license fees until the end of this notice period. As the computation of the amount of fees due was merely a mathematical determination, there was no need to submit this question to the jury.

[6] Defendant's third argument is that the trial court erred in submitting to the jury the issues of fraud and punitive damages. On this contention, we agree with defendant. The issues submitted to the jury, and the jury's answers thereto, are as follows:

ISSUES

1. After termination of the contract on October 1, 1980, did John E. McDaniel thereafter breach the contract?

   ANSWER: Yes

2. What amount, if any, is plaintiff, Marcoin, Inc., entitled to recover from defendant, John E. McDaniel:

   | Fair market value of client accounts subject to the contract as of 10/1/80 | $66,010.00 |
   |---|---|
   | Less: Marcoin's purchase price of accounts pursuant to contract | -$30,361.00 |

   ANSWER: Damage                                    $35,649.00

3. Did defendant, John E. McDaniel, sell client accounts which were subject to Marcoin's right to purchase under the contract with intent to defraud plaintiff of its option to purchase those accounts?

   ANSWER: Yes

4. What amount, if any, is plaintiff entitled to recover for punitive damages from John E. McDaniel?

   ANSWER: $16,000.00

The theory on which these issues were premised, and hence punitive damages awarded, is that this is a case for breach of con-

tract accompanied by fraud, for which punitive damages are allowable. *Hill v. Memorial Park*, 50 N.C. App. 231, 275 S.E. 2d 838, *reversed on other grounds*, 304 N.C. 159, 282 S.E. 2d 779 (1981). Although true, this theory has no applicability to the case at hand. The evidence showed that the client accounts were sold to a corporation whose stockholders were either related to defendant or were his close business associates, that they were sold during the pendency of a suit wherein substantial damages were sought, and that they were sold for far less than their market value. This is not fraud. This is a fraudulent conveyance. *See Nytco Leasing v. Southeastern Motels*, 40 N.C. App. 120, 252 S.E. 2d 826 (1979). Even the wording of the third issue is consistent with the elements of fraudulent conveyance, not of fraud.

[7] Once it is established that this case involves a fraudulent conveyance rather than a legal fraud, the law in this area makes it clear that the plaintiff was not entitled to punitive damages. In North Carolina, punitive damages are generally not allowable for a breach of contract, unless there is an identifiable tort constituting or accompanying the breach, which tort contains some element of aggravation. Commenting on which breaches of contract give rise to a claim for punitive damages, our Supreme Court has said that

> [w]hile the distinction between malicious or oppressive breach of contract, for which punitive damages are generally not allowed, and tortious conduct which also constitutes, or accompanies, a breach of contract is one occasionally difficult of observance in practice, it is nevertheless fundamental to any consideration of the question of punitive damages in contract cases.

*Newton v. Insurance Company*, 291 N.C. 105, 111-12, 229 S.E. 2d 297, 301 (1976). In making this distinction here, we conclude that however malicious and oppressive the conveyance of client accounts might have been, the conveyance did not constitute, nor was it alleged to be, a fraud or any other identifiable tort. Rather, the allegations in the amended complaint amount to allegations of a fraudulent conveyance, illustrating *how* the contract was breached. The jury found for the plaintiff on the issue of breach of contract; the jury awarded the plaintiff compensatory damages. At that point, there was nothing further for the jury to decide. It

was therefore unnecessary to submit the fraudulent conveyance issue to the jury, and error to award punitive damages.

**[8]** Defendant's fourth argument is that the trial court erred in denying his motion to continue, thereby denying him adequate time to prepare his case. This argument is founded on defendant's incorrect assertion that he only had five working days to prepare for the second trial. Plaintiff's motion to amend his complaint was granted on 23 September 1982. Trial on the issues raised by the amended complaint was set for 6 December 1982. Defendant moved to dismiss the amended issues, for a mistrial and for a new jury. His motions were denied on 24 November 1982. On 29 November 1982 defendant began discovery on the amended issues. Apparently, it is from this date that he believes his trial preparation time should be counted. It was within defendant's discretion to opt for the strategy of waiting until the disposition of his motions before commencing discovery; however, when such a strategy fails, he cannot use his self-imposed delay to support a request for a continuance. Defendant had more than two months to prepare his case for trial; we believe this was sufficient.

**[9]** Defendant's fifth argument is that the trial court erred in denying his motions for a mistrial and for a new jury to hear the amended issues because the jury had been exposed to prejudicial comments by the court. Defendant cites such comments by the trial judge as, "I don't want you gentlemen to play games," and "I don't want any 'to the best of your knowledge,'" as support for his argument that an impression was created on the jury that the judge was expressing an opinion on the evidence or that he disbelieved the defendant's testimony.

The conduct of a trial is left to the sound discretion of the trial judge, and absent abuse of discretion, will not be disturbed on appeal. We do not believe that these few minor comments, made during the course of a week-long trial and one of which is directed at both parties' attorneys, reflect an abuse of discretion. Further, defendant makes no showing of either error or prejudice arising from these remarks. Therefore, we find no merit in defendant's argument.

Defendant's final argument is that the trial court erred in allowing evidence to be admitted concerning defendant's sale of his client accounts. Plaintiff's original complaint sought specific

performance of the provision of the license agreement requiring defendant to sell his client accounts to plaintiff upon termination of the agreement. When, at trial, defendant for the first time stated that he no longer owned the client accounts, the issue of their sale became of prime importance. Plaintiff was therefore permitted to amend his complaint and a second trial was set to hear the issues raised by the sale. As the issue of ownership of the client accounts was central to one of the claims for relief, we find that the trial court did not err in allowing evidence of the sale to be admitted.

Affirmed in part; reversed in part.

Judges HEDRICK and WELLS concur.